# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| GREGORY JOSEPH PERRIERA, JR., <br> Plaintiff, <br> v. <br> JOSEPH LOPINTO, III, *et al.*, <br> Defendants. | CIVIL ACTION NO. 22-274 <br> SECTION "O" (5) <br> Judge Brandon S. Long <br> Magistrate Judge Michael B. North |

## PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Plaintiff Gregory Joseph Perriera, Jr. is a thirty-eight-year-old man who lives at B.B. Rayburn Correctional Center in Angie, Louisiana.[1]

2. Mr. Perriera is a United States Citizen.[2]

3. Mr. Perriera was born in New Orleans, Louisiana, and is from the East Bank.[3]

4. Mr. Perriera was detained at Jefferson Parish Correctional Center ("JPCC") from July 2017 until May 2022.[4]

5. While at JPCC, Mr. Perriera was detained pre-trial from July 2017 until his sentencing date of March 21, 2022.[5]

6. While incarcerated at JPCC, Mr. Perriera developed "enemy" relationships with Gennara Woodfork, Shyheem Frye, Omar Long, Herman Raney, Ralph Holmes, and Nigel Taylor.[6]

7. Mr. Perriera believed that Woodfork and Frye resented him because he refused to help them pass contraband through JPCC, and the others, whose names he did not know prior to his

---

[1] Perriera Decl. ¶1.
[2] Perriera Decl. ¶ 2.
[3] Perriera 5:24-25, 6:1, Exhibit 2; Perriera Decl. ¶4.
[4] Perriera Decl. ¶3.
[5] Perriera 20:11-19, Exhibit 2.
[6] Perriera Decl. at ¶ 5.

1

placement in 3DR on January 25, 2055, did not like him because they were associates of Woodfork and Frye, and because most of them were from the West Bank.[7]

8. Joseph P. Lopinto, III is the Sheriff of Jefferson Parish and the final policymaker for the Jefferson Parish Correctional Center.[8] He employs approximately 1,500 people, including all of the other defendants in this suit.[9]

9. Defendant Sue Ellen Monfra, the Correctional Administrator of JPCC, oversees its daily operations[10] and reports directly to Defendant Lopinto.[11] She is responsible for writing and revising policies at JPCC[12] and oversees its daily operations.[13] She has ultimate approval over JPCC policies.[14]

10. Defendant Christian Silbernagel is a sergeant and is the Classification Commander at JPCC.[15] He supervises the Classification Officers.[16] His job is to "Make sure people are housed correctly, make sure they're doing their job correctly by housing them, reviewing documents that they --that -- based on housing inmates."[17]

11. At all times relevant to this matter, Defendant Sergeant Jody Lee Banks was an Inmate Security Day Watch Supervisor at JPCC.[18] He supervised all of the deputies and detained individuals in the North Wing of JPCC in 2022.[19] His job responsibilities were "creating a schedule for the Deputies during security checks with the inmates, ensuring that the

---

[7] Perriera Decl. at ¶¶ 5-9.
[8] Lopinto 7:14-21, 25:6-14, Exhibit 3.
[9] Lopinto 22:6-16, Exhibit 3.
[10] Monfra 23:9-14, Exhibit 4.
[11] Monfra 34:11-15, Exhibit 4.
[12] *Id.* at 23:15-17.
[13] Monfra 23:9-14, Exhibit 4.
[14] Monfra 24:11-14, Exhibit 4.
[15] Silbernagel 43:4-12, Exhibit 10.
[16] Silbernagel 44:25, 45:1-7, Exhibit 10.
[17] Silbernagel 48:1-6, Exhibit 10.
[18] Banks 24:20-25, 25:1-17, Exhibit 11;
[19] Banks 27:15-22, Exhibit 11.

2

inmates are in compliance with the rules and again doing security checks -- doing walk arounds, making sure the Deputies are doing their job."[20]

12. Defendant Shayna Watkins was a Classification Officer in January 2022.[21] As a classification officer, Defendant Watkins was "in charge of the inmate movement of the jail."[22]

13. Defendant Shardai Locke was working in Inmate Security Day Watch at Jefferson Parish Correctional Center in 2022, as a Central Control Deputy.[23] As part of her job duties, Defendant Locke monitored three holding tanks and kept a log in which, among other things, she documented enemies reported to her; and conveyed the enemy report to her supervisor.[24] If someone informed Defendant Locke of enemies, Defendant Locke would document it in the logbook and report it to her supervisor.[25]

14. Defendant Melvin Francis was working for Inmate Security Day Watch and Security and Investigation at JPCC at JPCC, on January 25, 2022.[26] Defendant Francis was an Investigator with the Special Investigation Unit ("SIU") in January 2022.[27] His role included "dealing with investigating criminal matters involving inmates as well as employees."[28] He also handled disciplinary action reports, where he went "on the tiers and [he] issue[d] out disciplinary on inmates who get in trouble."[29]

---

[20] Banks 28:6-13, Exhibit 11.
[21] Watkins 12:14-16, Exhibit 12.
[22] Watkins 15:21-25, 16:1, Exhibit 12.
[23] Defendant Locke's Time & Attendance – Employee Timecard Report for January 25, 2022, Exhibit 6; Locke I, 26:23-25, 27:1-4, Exhibit 1.
[24] Locke I, 27:8-18, Exhibit 1; Locke II, 22:15-17, Exhibit 13; Locke II, 30:8-25, 31:1-17, Exhibit 13; Locke Day Watch Log, January 25, 2022, Exhibit 14.
[25] Locke II, 30:8-25, 31:1-17, Exhibit 13.
[26] Defendant Francis' Time & Attendance – Employee Timecard Report for January 25, 2022, Exhibit 5;
[27] Francis 15:7-10, 16:5-24, Exhibit 15.
[28] Francis 24:24-25, 25:1-3, Exhibit 15.
[29] Francis 27:7-14, Exhibit 15.

15. A "pod" is a dormitory where detained individuals are housed.[30] Pod 3DR has a dayroom.[31] A deputy who supervises a pod is not inside the pod with detained individuals but is posted in a small booth that is connected to the pod.[32]

16. "Rack back" occurs when the control deputy opens the cells in a pod every hour for five minutes.[33] During that time, detained individuals are allowed to come in and out of their own cells, but are not supposed to enter other people's cells.[34] Officers should monitor a pod while "rack back" is occurring.[35] The cell doors should not be left open if a deputy leaves the pod.[36]

17. JPCC Procedure 3.4.13 states, in part:

> (B)(1) If an inmate claims he is under threat from other inmates, it is the responsibility of S.I.U. to evaluate the claim and take appropriate measures. (B)(2) S.I.U. shall interview the inmate in an attempt to identify all known Inmates with whom the subject inmate should not come into contact (enemies, relatives, persons with whom he is charged for the same crime). (B)(3) If an inmate claims to have enemies but says their identities are unknown, S.I.U. shall evaluate and document the credibility of threat. (B)(4) After evaluating the threat to the inmate, S.I.U. shall take appropriate measures: movement to the protective custody housing area; movement to another housing area in general population; referral for a hearing regarding Administrative Segregation (protective custody). (B)(5) If no credible threat to the inmate can be identified, but the inmate still claims to be under threat, he should be moved to another area of the jail.[37]

18. Despite Procedure 3.4.13, JPCC personnel testified as to contradictory understandings of how to address reported enemies. Ms. Watkins believes that a detained individual had to

---

[30] Locke II, 8:12-14, Exhibit 13.
[31] Locke II, 12:17-19, Exhibit 13.
[32] Locke II, 14:17-21, Exhibit 13.
[33] Locke II, 9:24–10:17, Exhibit 13.
[34] Locke II, 9:24–11:19, Exhibit 13.
[35] Locke II, 11:20-25, Exhibit 13.
[36] Locke II, 15:20-16:11, Exhibit 13.
[37] JPCC 3.4.13, Exhibit 16.

provide the legal name of an enemy in order to have any action taken, testifying "Once I asked, can he name, he said, 'no,' that was the end of the conversation for me."[38]

19. Deputy Chief Monfra, who oversees policy promulgation and enforcement at JPCC, testified that "It would require more than you just telling me somebody's nickname and not letting me know why this is a credible threat that would . . make us take – a different action"[39] and that SIU does "not necessarily" get involved in investigating when an incarcerated person says they are being housed with an enemy.[40]

20. Classification does not notify SIU when a detained individual claims to be in danger.[41]

21. In fact, Silbernagel—Supervisor of Classifications—does not know who is supposed to refer a pre-trial detainee to SIU.[42]

22. In the practice of the JPCC Classification Department, there is no rule as to when SIU should be contacted, despite explicit written policy to the contrary.[43]

23. In January of 2022, Mr. Perriera resided in Pod 3B where he was assigned to a top bunk.[44] Because of a medical issue, Mr. Perriera needed a bottom bunk.[45]

24. On January 25, 2022, Mr. Perriera learned that he was to be moved to Pod 3DR.[46] Mr. Perriera informed Defendant Sergeant Jody Lee Banks, an Inmate Security Day Watch Supervisor at JPCC, that he had enemies in Pod 3DR, and gave him the legal names of two of his enemies—Shyheem Frye and Generra Woodfork.[47] Mr. Perriera also informed

---

[38] Watkins 81: 7-18, 83:6-8, Exhibit 12.
[39] Monfra 133:16-19, Exhibit 4.
[40] Monfra 147:3-8, Exhibit 4.
[41] Silbernagel 80:9-12, Exhibit 10.
[42] Silbernagel 139:22–140:4, Exhibit 10.
[43] Silbernagel 83:16–84:5, Exhibit 10.
[44] Move Sheet, January 25, 2022, Exhibit 17.
[45] Perriera JPSO Inmate Profile, p. 1, Exhibit 18.
[46] Perriera Decl. ¶ 12.
[47] Banks Inter-Office Memorandum, January 25, 2022, Exhibit 19; Banks 24:20-25, 25:1-17, Exhibit 11; Perriera Decl. ¶12.

5

Defendant Banks that he had enemies whose legal names he did not know, but that he could point them out.[48]

25. Mr. Frye and Mr. Woodfork were both moved out of Pod 3DR.[49] Mr. Perriera was placed in a second floor holding cell.[50] The enemies whose legal names Mr. Perriera did not know remained in 3DR.[51]

26. Defendant Shardai Locke was assigned to Central Control and Defendant Shayna Watkins was assigned to Classification on January 25, 2022.[52] Defendant Watkins dropped the Day Watch final move sheet off to Defendant Locke.[53] The move sheet showed that Mr. Perriera was to be moved from 3BR09B to 3DR07A that day.[54]

27. While Defendant Watkins was in Central Control, Mr. Perriera asked her to come to the door.[55] He told Defendant Watkins that he could not be moved to 3DR because "the guys over there are friends."[56] Classification had already moved the enemies whose legal names Mr. Perriera had provided, so Defendant Watkins asked whether Mr. Perriera could name anyone else.[57] He responded that he was not able to do so.[58]

28. Mr. Perriera told Defendant Locke that he did not want to move and that he had enemies, but Defendant Locke told Mr. Perriera that he could not choose where he wanted to go.[59]

---

[48] Perriera Decl. ¶13.
[49] Move Sheet, January 25, 2022, Exhibit 17.
[50] Perriera Decl. ¶13.
[51] Perriera Decl. ¶14.
[52] Locke Inter-Office Memorandum, February 8, 2022, Exhibit 20; Locke I,.21:3-13, Exhibit 1; Watkins 11:19-25, 12:1-3, 12:8-16, Exhibit 12.
[53] Locke Inter-Office Memorandum, February 8, 2022, Exhibit 20; Move Sheet, January 25, 2022, Exhibit 17.
[54] Move Sheet, January 25, 2022, Exhibit 17.
[55] Watkins Inter-Office Memorandum, February 8, 2022, Exhibit 21;
[56] Watkins Inter-Office Memorandum, February 8, 2022, Exhibit 21; Perriera Decl. ¶16.; Watkins 53:14-23, Exhibit 12.
[57] *Id*.
[58] *Id*. Perriera Decl. ¶16.
[59] Locke Inter-Office Memorandum, February 8, 2022, Exhibit 20. Perriera Decl. ¶15; Locke II, 28: 10-12, Exhibit 13.

6

Mr. Perriera did not provide their legal names.[60] Defendant Locke did not include Mr. Perriera's report of enemies in the logbook.[61] Defendant Locke did not move Mr. Perriera but notified Deputy Nakia Taylor who was assigned to the evening watch central control that Mr. Perriera was in the north wing holding tank awaiting a move to 3D.[62]

29. On January 25, 2022, Mr. Perriera was moved from Pod 3BR to Pod 3DR.[63]

30. Mr. Perriera spoke to Defendant Francis twice on January 25, 2022. First, while Mr. Perriera was in the second floor holding cell, Mr. Perriera told Defendant Francis that he was being moved to 3DR but that he had enemies there. Defendant Francis said there was nothing he could do about it because it was Classification's decision. Then, Mr. Perriera spoke to Defendant Francis again after he had been moved to 3DR. Mr. Perriera said that he needed to speak to him privately because he had enemies in the pod, but Defendant Francis told Mr. Perriera that he would be alright.[64]

31. Deputy George Pepis was the Pod Control Officer assigned to supervise Pod 3DR at the time another deputy moved Mr. Perriera there.[65] Sometime after Mr. Perriera arrived at 3DR and put his belongings inside his cell, Deputy Pepis opened the cells—a practice known as "rack back."[66] After initiating "rack back," Deputy Pepis left the area to assist with an incident that involved an incarcerated person on Pod 3DL who was reportedly exposing his genitals in the shower area, and he left the cell doors open while he was

---

[60] Locke Inter-Office Memorandum, February 8, 2022, Exhibit 20; Perriera Decl. ¶15.
[61] Locke II, 31:18-25, 32:1-6, 19-25, 33:1-6, Exhibit 13.
[62] Locke Inter-Office Memorandum, February 8, 2022, Exhibit 20.
[63] Move Sheet, January 25, 2022, Exhibit 17; Perriera Decl. ¶19, Exhibit.
[64] Perriera Decl. ¶17.
[65] Pepis Inter-Office Memorandum, March 8, 2022, Exhibit 22; Wilkie Response to Grievance, April 5, 2022, Exhibit 23.
[66] Perriera Decl. ¶19.

7

gone.[67] While he was assisting with that incident, he was unable to see any events taking place in Pod 3DR.[68]

32. Two detained individuals in the pod came into Mr. Perriera's cell, took his property, and ran into another cell. When he followed them to try to get his things back, one person hit him. As Mr. Perriera tried to defend himself another detained individual hit him. Three more people came into the cell and jumped him.[69]

33. One of the attackers had a shank and cut Mr. Perriera's arm and neck. The attackers hit and kicked Mr. Perriera in his head, ribs, back, and face.[70]

34. It was only after Mr. Perriera was placed in 3DR that he learned the legal names of the enemies that he had told Sergeant Banks about earlier—Omar Long, Herman Raney, Ralph Holmes, and Nigel Taylor.[71]

35. After attending to the incident, Deputy Pepis made his periodic security checks on Pod 3DL.[72] While he was doing this, Mr. Perriera was able to get Deputy Pepis' attention after the attack, and told him that he wanted to "check out" of Pod 3DR.[73] He stated, "I've got enemies in here."[74] Deputy Pepis notified Sergeant Brenda Lee that Mr. Perriera had packed his belongings and that he demanded to speak to a ranking officer.[75]

---

[67] Pepis Inter-Office Memorandum, March 8, 2022, Exhibit 22; Evening Watch Log Book Entry, January 25, 2022, p. 88, Exhibit 24; Perriera Decl. ¶19.
[68] Nigel Taylor Inmate Disciplinary Action Report, p. 2, Exhibit 25.
[69] Perriera Decl. ¶ 21.
[70] Perriera Decl. ¶¶ 21, 22.
[71] Perriera Decl. ¶13.
[72] Pepis Inter-Office Memorandum, March 8, 2022, Exhibit 22.
[73] Evening Watch Log Book Entry, January 25, 2022, p. 88, Exhibit 24; Pepis Inter-Office Memorandum, March 8, 2022, Exhibit 22.
[74] Nigel Taylor Inmate Disciplinary Action Report, p. 2, Exhibit 25; Perriera Decl. ¶ 23.
[75] Nigel Taylor Inmate Disciplinary Action Report, p. 2, Exhibit 25.

36. Deputy Terrance Holmes escorted Mr. Perriera to the Lieutenants' Office where Sergeant Lee interviewed him.[76] Mr. Perriera told her that several inmates attacked him in cell 3DR01 and stole his commissary, new, white, size 11 tennis shoes, and books.[77] Mr. Perriera told Sergeant Lee that his attackers were Omar Long, Herman Raney, Ralph Holmes and Nigel Taylor.[78] Pod 3D was locked down for the rest of the night.[79]

37. Sergeant Lee and Lt. Timothy Berrian searched cell 3DR01, the cell of Omar Long[80], and found: (1) books with Mr. Perriera's name written in them, (2) books that had been previously listed by Mr. Perriera as having been stolen but that did not have his name on them, and (3) a pair of size 11 tennis shoes that did not fit Omar Long.[81] Omar Long denied ownership of the books found that did not have Mr. Perriera's name written in them.[82] The books and the shoes were returned to Mr. Perriera.[83]

38. Mr. Perriera was escorted to the medical clinic and Amy Ramirez, a nurse for CorrectHealth, examined him.[84] Nurse Ramirez documented that Mr. Perriera had a 10-inch scratch on his left forearm.[85] She also noted that he appeared anxious and upset.[86] Mr. Perriera was then moved to a second floor holding cell for his safety.[87] Mr. Perriera did not

---

[76] Nigel Taylor Inmate Disciplinary Action Report, p. 2, Exhibit 25.
[77] Nigel Taylor Inmate Disciplinary Action Report, p. 2, Exhibit 25; Lee Inter-Office Memorandum, January 25, 2022, Exhibit 26.
[78] Perriera Preliminary Inmate Injury Report, January 25, 2022, Exhibit 27; Lee Inter-Office Memorandum, January 25, 2022, Exhibit 26.
[79] Evening Watch Log Book Entry, January 25, 2022, p. 88, Exhibit 24.
[80] JPSO Jail Location Report, Exhibit 28.
[81] Evening Watch Log Book Entry, January 25, 2022, p. 88, Exhibit 24; Nigel Taylor Inmate Disciplinary Action Report, p. 2, Exhibit 25.
[82] Nigel Taylor Inmate Disciplinary Action Report, p. 2, Exhibit 25.
[83] *Id.*; Evening Watch Log Book Entry, January 25, 2022, p. 88, Exhibit 24
[84] Evening Watch Log Book Entry, January 25, 2022, p. 88, , Exhibit 24; Perriera CorrectHealth Patient Note, January 25, 2022, Exhibit 29; Perriera Preliminary Inmate Injury Report, January 25, 2022, Exhibit 27.
[85] Perriera CorrectHealth Patient Note, January 25, 2022, Exhibit 29; Perriera Preliminary Inmate Injury Report, January 25, 2022, Exhibit 27.
[86] Perriera CorrectHealth Patient Note, January 25, 2022, Exhibit 29.
[87] Perriera Preliminary Inmate Injury Report, January 25, 2022, Exhibit 27; Lee Inter-Office Memorandum, January 25, 2022, Exhibit 26.

press criminal charges against any of the perpetrators[88] but, internally at JPCC, Omar Long was charged with battery and stealing.[89] Herman Raney, Ralph Holmes, and Nigel Taylor were charged with battery.[90]

39. Mr. Perriera later realized he had cuts on his arm and neck, knots on his head, and bruises on his head and rib cage.[91]

40. Mr. Perriera filed two grievances in this matter.[92] On January 26, 2022, Mr. Perriera filed a grievance stating that, on January 25, 2022, he told Defendants Watkins and Locke that he had enemies in Pod 3DR, and that he would "get jumped" if Defendants moved him there.[93] On January 30, 2022, Mr. Perriera filed a second grievance stating that inmates attacked him and stole his commissary while Deputy Pepis was not properly supervising 3DR.[94] Mr. Perriera still suffers from difficulty sleeping, nightmares, paranoia, and migraine headaches.[95]

41. Plaintiff's expert, Martin Horn, former New York City Correctional Commissioner and Pennsylvania Secretary of Corrections opined:

> The named defendants, Sheriff Lopinto, Deputy Chief Monfra, Sgts. Silbernagel, Banks and Watkins failed to follow to the jail's policies and procedures and thereby failed in their affirmative duty to protect Mr. Perriera from harm insofar as, on January 25, 2022, with respect to his assertion that he had enemies in 3DR they did not take the actions required prior to him being transferred there.[96]

---

[88] Nigel Taylor Inmate Disciplinary Action Report, p. 2, Exhibit 25.
[89] Omar Long Inmate Disciplinary Action Report, p. 1, Exhibit 32.
[90] Herman Raney Inmate Disciplinary Action Report, p. 1, Exhibit 33; Ralph Holmes Inmate Disciplinary Action Report, p. 1, Exhibit 34; Nigel Taylor Inmate Disciplinary Action Report, p. 1, Exhibit 25.
[91] Perriera Decl. ¶ 28.
[92] Perriera Grievance, January 26, 2022, Exhibit 30; Perriera Grievance, January 30, 2022, Exhibit 31.
[93] Perriera Grievance, January 26, 2022, Exhibit 30.
[94] Perriera Grievance, January 30, 2022, Exhibit 31.
[95] Perriera Decl. ¶ 31.
[96] Horn Expert Report, p. 17, Exhibit 35.

Sheriff Lopinto and Deputy Chief Monfra failed to adequately perform their executive responsibilities insofar as the record reflects confusion and inadequate training of their staff with respect to how to keep inmates safe in accordance with minimally acceptable correctional practices, and the requirements of their own policies JPCC 3.4.9, and JPCC 3.4.13, as evidenced by the confusion supervisory staff, Sgts. Banks, Watkins and Silbernagel concerning the proper way in which to manage an inmate who expresses fear of enemies but cannot specifically identify the enemies.[97]

Sgts. Banks, Silbernagel, and Watkins failed to meet their obligation to keep Mr. Perriera safe from harm as required by JPCC 3.4.9 by moving him to 3DR without properly evaluating and responding to his claims that there were enemies in that pod as required by JPCC policy.[98]

---

[97] *Id*. at 18, Exhibit 35.
[98] *Id.* at.18, Exhibit 35.